## WILLIAM SCHWEICKER ET AL.

### v.

## GEORGE HUSSER ET AL.

*Injunctions—Ecclesiastical Law.*

1. A purely legislative body may not, as a general rule, delegate to another body its legislative functions; but it may be done in certain cases where the delegated power is partly legislative and partly executive.

2. A civil court should proceed with great hesitancy to declare that an ecclesiastical body, having plenary power, has so far overstepped the limits of its authority in a purely ecclesiastical matter as to warrant its

interference. As a general rule civil courts should not interfere unless there has been a violation of the law of the land, or a clear subversion of the fundamental law of the church.

3. In a controversy as to which of two bodies, that convened in different places, was the true general conference of a given church, each of said bodies laying claim thereto, this court, upon an examination of the discipline thereof, holds that the one held at Indianapolis, Indiana, was entitled to be so considered.

4. Upon a bill filed to restrain a clergyman from occupying a given pulpit, and from excluding one of complainants, also a clergyman, therefrom, this court declines, in view of the evidence, to interfere with the decree for the complainants.

[Opinion filed June 27, 1892.]

Appeal from the Superior Court of Cook County; the Hon. Henry M. Shepard, Judge, presiding.

Mr. A. M. Pence, for appellants.

Messrs. Judd, Ritchie & Esher, for appellees.

Gary, J. This is a church quarrel, the facts in relation to which are sufficiently stated in the opinion of Judge Shepard, who, having tried the case in the Superior Court, takes no part in its decision here, but whose opinion the presiding justice and I adopt as the opinion of this court.

Whether the case shows that the title to the realty, the church edifice and grounds, is so vested, or that the appellees, who were complainants below, have such an interest as to warrant the interference of a court of equity, we do not consider.

Of Sec. 71 of the "Discipline" of the denomination called the Evangelical Association of North America, the brief of the appellants says: "The true construction of this section constitutes substantially the only question involved in this case;" and it asks "a decision thereon, in order that peace may be secured between the warring factions of this association in this State, and there can be no peace until this * * * question is authoritatively decided." That au-

thoritative decision can be only by the Supreme Court, and to our minds it should be such as Judge Shepard has made, and for the reasons he has given. The decree of the Superior Court is therefore affirmed. The opinion of Judge Shepard is as follows:

SHEPARD, J. "The complainant, Husser, is a preacher in the church known as the Evangelical Association of North America, and so is the defendant, Schweicker. Each of them claims to be the duly appointed preacher and pastor of the St. John's Society of said church, in Chicago, by virtue of his assignment thereunto in the manner and by the authority prescribed in the rules governing said church organization, known as its discipline, and each one has numerous adherents, members of said church, some of whom are respectively co-complainants and co-defendants in this suit. Schweicker and his adherents are in occupancy of the church edifice belonging to said local society, and exclude Husser from officiating therein as preacher, and this suit is brought to restrain such occupancy and exclusion by way of injunction. This particular difficulty has grown from and is a part of the much greater controversy existing in the said Evangelical Association between what may, for short, be called the Bishops Esher and Bowman faction on the one side, and the Bishop Dubs faction on the other.

The complainant, Husser, bases his claim of right to exercise the functions of preacher and pastor, as stated, upon the claim of authority and supremacy of the first named faction, and the defendant, Schweicker, holds possession upon the claim of authority and supremacy of the last named faction; and hence it becomes necessary to determine as between these two rival sources of power, which one is the lawful authority.

Were I persuaded that the decree to be entered at this time would finally end this unfortunate controversy, it would be of profit to examine into and discuss the history of the Evangelical Association during its hundred years of existence, its system of organization and discipline, and each

Schweicker v. Husser.

one of the numerous phases of the controversy set forth in the pleadings.   But, to quote the poet,

' Christians have burnt each other, quite persuaded
That all the Apostles would have done as they did ; '

and there is no likelihood that the armor-bearers will lay aside the sword of the law until the court of last resort shall have decided the contest, and it will therefore suffice, if, in this out-post engagement, I confine myself to a single controlling issue.

Shortly after the adjournment of the general conference of Buffalo, in 1887, accusations of one kind and another were made against each one of the three bishops of the church—Esher, Bowman and Dubs—and such charges finally took form, and culminated in the separate trial and suspension of each of said bishops.   Whether either one of those trials was regular, or the sentences of suspension imposed were valid and binding, it is not necessary in this suit to decide, for the reason that all of the proceedings and judgments in those cases have been reviewed, and the validity thereof finally and conclusively determined by one of two pretended general conferences of the church, held in October, 1891, before the commencement of this suit.   By the discipline, as it is termed, of the church, the general conference is declared to be the supreme authority, and as such its action in ecclesiastical matters is not subject to review by any other tribunal, civil or ecclesiastical.   The serious difficulty occurs, however, in determining which one of the two bodies that convened in October, 1891, in Philadelphia and Indianapolis, respectively, was the true general conference of the church, each of said bodies laying claim thereto.   One or the other was certainly the true body.

The method of convening a general conference is prescribed by the discipline of the church, as follows :

' Sec. 71.   The time and place of the general conference shall be appointed by the bishops, with the consent of the majority of the conference ; and if there be no bishop present, the general conference shall do it by a majority of

votes, or the oldest annual conference, who then shall give the other annual conferences due notice of the time and place.'

Acting in the line of authority conferred by the section just quoted, the general conference which assembled in Buffalo in 1887, concerning the regularity of which there is no question, resolved that the next general conference should be held on the first Thursday in October, A. D. 1891, and that the matter of appointing the place of holding the same should be left to the board of publication. The resolution appointing the time for the next general conference, as well as that conferring upon the board of publication the duty of appointing the place for holding the same, was adopted unanimously, no one questioning the power of the general conference to delegate to the board of publication the duty of appointing the place until long after the adjournment of the conference. In October, 1890, the board of publication met, and claiming to act by virtue of the resolution of the general conference of 1887, already referred to, appointed Indianapolis as the place for the assembling of the next general conference; and by that time, dissension having spread, a certain faction in the East Pennsylvania annual conference, adherents of Bishop Dubs, at a meeting in February, 1891, claiming to be the East Pennsylvania conference and therefore the oldest annual conference, and by reason thereof entitled, under the power conferred upon it by the section of the discipline already quoted, to appoint the place for the meeting of the next general conference, appointed the city of Philadelphia as such place.

The two general conferences met at the same time but at different places, and were respectively dominated at Indianapolis by the supporters of Bishops Esher and Bowman, and at Philadelphia by the supporters of Bishop Dubs. The conference held at Indianapolis annulled and set aside as void the sentences of suspension against Bishops Esher and Bowman, and confirmed that against Bishop Dubs; and the Philadelphia conference sustained the sentences against the

·two first named bishops, and set aside that against the latter. Each conference claimed itself to be the only duly appointed general conference of the church, and upon the correctness of this assumption and claim by either one, the rights of the respective parties to this suit depend.

Admitting the oldest annual conference to be that of East Pennsylvania, the right of that body to fix the place of holding the general conference is quite plain, if neither of the methods first entitled to be employed for that purpose have been resorted to. The methods, and the only ones, provided by the discipline for the calling of a general conference, are found in Sec. 71, already quoted. It is therein unmistakably provided that the time and place may, in the first instance, be appointed by the bishops, with the consent of a majority of the conference. In attempted compliance with this method the Buffalo conference in 1887 fixed the time, but left the matter of appointing the place to the board of publication, which, as before stated, subsequently acted by appointing Indianapolis as the place. Was the delegation to the board of publication, by the unanimous vote of the general conference, including the three bishops, of the matter of selecting the place, a compliance with the discipline? or rather, was it such a violation of the discipline as to permit of the alternative right of another body to assume the act of delegation to be void, and thereupon claim and exercise the alternative power?

A purely legislative body may not, as a general rule, delegate to another body its legislative functions. And yet there is a class of cases where the delegated power is partly legislative and partly executive, like the fixing of tolls by canal commissioners, and the fixing of inspection fees by warehouse commissioners, duties that the legislature has undoubted power to perform, that the Supreme Court of this State has held the legislature might well delegate. The board of publication was an executive body of the church, existing under the discipline, to which the general conference might, without doubt, commit the duty of procuring a hall for the meeting of the conference and all

plans for the entertainment of delegates, and it is difficult to distinguish wherein the duty of inquiring into and fixing upon the place for holding the next conference partakes of legislation in any material degree beyond that of performing such other details as those mentioned. Both are merely directory and executive in character, and are mere administrative details to enable the governing body of the church to conveniently perform its legislative functions. And indeed it seems to me to be a very strained interpretation of that section of the discipline covering this question to argue otherwise. The language is: 'The time and place of the general conference shall be appointed by the bishops, with the consent of the majority of the conference.' An appointment of time and place by the bishops is not in the line of legislation, and neither is the act of concurrence by a majority of the conference. The latter is a mere prerequisite to the taking effect of an act by the bishops. It has never been supposed that the appointment by the executive of the United States, or of a State, of an officer to whose appointment the consent of the Senate is necessary, is a legislative act by either the executive or the Senate. The language of the Constitution of the United States providing that the President, 'by and with the advice and consent of the Senate, shall appoint' certain officers, is not unlike, in effect, that of the discipline quoted.

If, however, it should be that what was done in leaving to the board of publication was an unauthorized act of delegation, there is another view to be taken of the matter. The three bishops of the church were present in their official capacity, and in full and unquestioned exercise of their prerogatives as bishops of the Buffalo conference, and all that was there done in the matter under consideration was with their consent and by unanimous approval of the conference. The bishops, together with eight other persons elected by the general conference, constituted the board of publication, and two of the bishops did actually participate in the proceedings of that body when Indianapolis was selected as the place for holding the next general conference.

Furthermore, as a matter of fact, two-thirds in number of all the annual conferences in the church, viz., eighteen, out of a total of twenty-five, ratified the action of the board of publication by sending delegates to the Indianapolis conference. May it not be fairly said that the selection by the board of publication, including the two bishops, with the thereunto previous unanimous consent of the general conference, was an act of the bishops, with the consent of the majority of the conference, in sufficient compliance with the letter as well as the spirit of the discipline of the church? But whether such were the opinion of this court or not, who may complain or who question?

Other sections of the discipline provide as follows:

' Sec. 73. The general conference shall have power to make rules and arrangements for our church, under the following restrictions:' and there follow certain enumerated limitations not touching the matter in question.

' Sec. 74. The general conference is the supreme court of law in the church. * * * It shall have power to make such rules and regulations as will enable it to execute the powers conferred upon it.'

The convening of the general conference is a matter of purely ecclesiastical regulation, and if the method therefor provided by the discipline has been faultily exercised by those upon whom the power was conferred, the judgment of the general conference as ' the supreme court of law in the church,' upon the sufficiency of the manner in which the duty was to be performed, or as to whether what was done was more than a mere "arrangement" for church purposes, is determinative and conclusive of the question, and no outside tribunal nor any subordinate authority within the church itself may interfere. The Buffalo conference, by unanimous approval of the method itself adopted for the convening of its successor, gave a determinative construction of Sec. 71, and placed its action beyond reversal or review. It acted upon the very question lying at the heart of this controversey and settled it. Universal assent in that conference was accorded to its construction as to what was a compliance with the discipline and its own

powers. It is not as if there had been an open and shameless setting at naught of a provision of the discipline, binding upon itself as well as others, amounting to fraudulent conduct, but there was instead a clear attempt to effectuate, in a manner sanctioned by precedent in its own and in the counsels of other churches possessing kindred systems of organization, a duty imposed upon it to provide a time and place for the meeting of its successor, and the worst that can be said is that it was guilty of mere irregularity — such an irregularity as needs no citation of authorities to show did not invalidate its action. It appears in evidence that at a former time in the history of the church a closely analogous method of fixing the place for holding a general conference was adopted and no question raised, and that the Methodist church, the parent of this association, has, at times, adopted similar means, under like circumstances, without question. So that a construction by usage comes to the further aid of the validity and regularity of the action of the Buffalo conference in the matter under consideration.

To conclude, a civil court should proceed with great hesitancy to declare that an ecclesiastical body, having plenary power, like the general conference of this church, had so far overstepped the limits of its authority in a purely ecclesiastical matter as to warrant its interference. As a general rule it may be said that the civil courts should not interfere unless there has been a violation of the law of the land, or a clear subversion of the fundamental law of the church. There is in this case no pretense of a violation of the laws of the land, and I think it can not be fairly said that the discipline of the church has been given anything more than, at the most, a doubtful construction by the supreme authority within the church, in which case, as matter of law, the correctness of its construction is presumed.

It must, therefore, be held that the Indianapolis conference was the true and regularly constituted general conference of 1891, and it following that the conference held in Philadelphia was without authority, it becomes unnecessary to determine or discuss the question in what cases the alter-

native right of the oldest annual conference to call the next general conference would happen. The proceedings of the Indianapolis conference were the proceedings of the only true and regular general conference of the church in 1891.

During the argument various decisions made in the course of litigation during the past two years, and involving this controversy in the Evangelical Association, have been cited by counsel for both sides. With one exception, all of these decisions relate to the state of affairs in the church as they existed prior to the convening in October last of the rival conferences at Indianapolis and Philadelphia, and discuss chiefly the regularity of the alleged suspensions of Bishops Esher and Bowman, and of the proceedings of the rival annual conferences in those districts where divisions in such conferences had occurred. Some of these decisions I understand to have held in favor of the validity of the alleged suspensions of the bishops, while others held to the contrary, but I do not consider these decisions as applicable to the case at bar, for the plain reason that since their rendition the highest tribunal of the church, having unquestionable jurisdiction in the premises, has passed upon the same matters, and the determination of that body in this regard is conclusive upon the civil courts. Each of the rival conferences at Philadelphia and Indianapolis claims to have disposed of all these matters. I have also seen the decision of Judge Shaw in the case of Blaser v. Tobias, rendered in December last, since the meeting of said general conferences, and discussing the proceedings of said rival conferences. But after giving due weight to the reasoning of Judge Shaw in that opinion, I am constrained to differ from him so far as certain expressions therein seem to recognize the regularity of the Philadelphia conference.

As a result, the Annual Illinois Conference, held in April, 1891, and presided over by Bishop Esher, was the only duly constituted body for the appointment of pastors within the Illinois conference, and the complainant, Husser, deriving therefrom his right and authority as preacher and pastor of the said St. John's Society, is entitled to the relief he and his co-complainants ask." *Decree affirmed.*